Filed 3/9/23; Opinion following order vacating prior opinion

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JOHN M. OLIVA,<br><br>　　　Defendant and Appellant. | E073979<br><br>(Super.Ct.No. FVI1503175)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.　Tony Raphael, Judge.　Affirmed in part, reversed in part with directions.

Jennifer Peabody and Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorneys

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of "DISCUSSION" parts "A" and "B."

1

General, Michael Pulos, Seth Friedman, Collette C. Cavalier, Kathryn Kirschbaum, Paige B. Hazard and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

David Bustamante (the victim) was shot and killed in the parking lot of an In-N-Out restaurant on Christmas Day in 2015. The victim was giving a tattoo to Nancy A. when he told her he had to go out to meet a friend, who he was going to give tamales that his mother had made. Ana S., who was Nancy's girlfriend, was with them. While the victim was driving, he received a phone call from a caller identified as Jboy 12th Street on the victim's phone advising him to drive to the In-N-Out in Hesperia. The victim drove up to a red truck that was parked in the parking lot. The victim exited his vehicle and the driver of the red truck immediately shot at the victim, yelling "La Eme" a term for the Mexican Mafia. Both Nancy and Ana identified defendant as the shooter; cellular telephone records placed defendant near the scene at the time of the shooting; and the victim listed defendant's cellular telephone number under the name Jboy 12th Street in his contacts. Defendant was convicted of first degree murder, the special circumstances of lying in wait and benefitting a criminal street gang, and weapons use and gang enhancements.

Initially, on appeal, defendant claimed that (1) the trial court violated his right to due process of law under the Fourteenth Amendment when it instructed the jury pursuant to CALCRIM No. 315 that the jurors could consider the witnesses' level of certainty when evaluating witness testimony; and (2) the trial court abused its discretion and denied his Fifth, Sixth and Fourteenth Amendment rights when it refused his request to

continue sentencing to allow him to have DNA testing completed in order to potentially file a supplemental motion for new trial.

After this court issued its opinion on the above issues, affirming the judgment in its entirety, the Legislature passed Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699 §§ 3, 4) (AB 333), effective January 1, 2022, which amended Penal Code section 186.22 and added Penal Code section 1109.[1] We recalled the remittitur, canceled the remittitur, vacated our previous opinion and had the parties submit supplemental briefing on the impact of AB 333 on the judgment in this case. Defendant contends that AB 333's amendments to section 186.22 changing the definitions of "criminal street gang" and "common benefit to members of a gang" should be applied retroactively. Based on these changes, remand for a new trial on the gang enhancements and the gang murder special allegation is necessary. The People concede these changes to section 186.22 are retroactive and that the gang enhancements should be retried. The People disagree that the gang murder special circumstance should be retried as this court should find that the amendments do not apply to the gang special circumstance because the amendments violate Proposition 21. If this court concludes that it is applicable to the gang special circumstance, then remand for retrial is appropriate.

In addition, defendant contends AB 333's addition of section 1109, which mandates that defendants who request to be tried separately on charged gang enhancements must be granted a second-phase trial on the gang enhancements, should be

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

3

applied retroactively. He insists that since the gang enhancements and gang special circumstance were tried with the substantive crimes in this case, he is entitled to remand for a new trial on all the charges. The People insist that section 1109 applies prospectively, and even if it does apply, defendant was not prejudiced by the admission of gang evidence at trial.

We issue this new opinion addressing both the issues first raised on direct appeal and the impact of AB 333.

## PROCEDURAL HISTORY

Defendant was charged in an amended information with one count of willful, premeditated, and deliberate first degree murder (Pen. Code, § 187, subd. (a)).[2] The information further alleged the special circumstances that defendant intentionally killed the victim while he was an active participant in a criminal street gang and the murder was carried out to further the activities of the criminal street gang (§ 190.2, subd. (a)(22)) and he was lying in wait (§ 190.2, subd. (a)(15)). It was additionally alleged that he personally and intentionally discharged a firearm, which caused great bodily injury or death (§ 12022.53, subd. (d)). It was also alleged that he committed the crime for the benefit of and at the direction of a criminal street gang (§ 186.22, subd. (b)(1)(c)). Defendant was found guilty of all the charges. In a bifurcated proceeding, the court found that defendant had suffered a prior serious and/or violent felony conviction (§§

---

[2] All further references are to the Penal Code unless otherwise indicated.

4

667, subds. (b)-(i); 1170.12, subd. (a)).  Defendant was sentenced to 25 years to life followed by life in prison without the possibility of parole.

**FACTUAL HISTORY**

A.     PEOPLE'S CASE-IN-CHIEF

1.     *SHOOTING*

On December 25, 2015, Nancy A. was given a Christmas gift by her girlfriend, Ana S., of a tattoo.  Ana contacted David the victim who was a tattoo artist.  The victim had previously given Nancy and Ana matching tattoos.  The victim agreed to give the tattoo to Nancy, and Ana booked the appointment for Christmas day.  Nancy and Ana only knew the victim from getting tattoos from him.

Nancy and Ana picked up the victim from a restaurant around 1:00 p.m. in Ana's car.  The victim was in a good mood.  They then drove the victim to his house in Victorville.  They arrived at his house around 2:00 p.m.  The victim set up the tattoo machine in his room.  The victim received a phone call as he was setting up the equipment and talked for some time with the person who called him.  He started on the tattoo.

Just before 3:00 p.m. on that day, the victim received another phone call.  When he got off the phone, the victim suggested to Ana and Nancy that they go get food and he told them he had to first meet his friend.  He wanted to give his friend tamales that his mother had made.  They got into the victim's white SUV.  The victim called the friend from the car and asked his friend where he wanted to meet.  Nancy believed they were

5

going to deliver the tamales, get pizza and return to the victim's house so he could finish her tattoo.

Nancy sat in the front seat and Ana sat in the back. The victim talked to his friend on speakerphone while he was driving. Nancy could see the screen on the phone and it showed he was talking to Jboy 12th Street. The friend told the victim to meet him at a gas station located near the freeway at Mariposa and Main Streets in Hesperia. He was not there when they arrived. The victim called his friend and asked where he was and he directed him to the In-N-Out restaurant next door. The victim drove into the parking lot of the In-N-Out and parked next to a red truck that was in the parking lot. The victim pulled up so that the driver's windows were facing each other.

The driver of the red truck had his window down. Nancy and Ana identified the driver of the red truck in court as defendant. Defendant asked the victim something about Nancy being his "boy." Nancy stated defendant's voice sounded the same as Jboy 12th Street who had been on the phone. The victim told him no, that he was just giving Nancy a tattoo. Nancy handed the victim the bag of tamales and the victim got out of the car to give them to defendant. Defendant pulled out a gun and shot the victim. Nancy stated that the gun was a revolver and defendant shot at the victim until the revolver was empty. The victim asked why he was shooting him when he fell to the ground. Defendant responded "La Eme." He repeated it several times while he shot the victim. Ana heard at least four gunshots.

Defendant quickly drove away. Nancy and Ana were afraid they would be shot and ducked down to protect themselves. They got out of the passenger's side door. Ana

6

called 911. Nancy got out of the truck and ran to the victim. He was on the ground. They told him to hang on and that they were getting him help. The victim was nonresponsive.

Nancy was shown a six-pack photographic lineup on the day of the shooting. She was unable to identify anyone. She recognized defendant in court. She insisted he was skinnier in the photographic lineup so she did not recognize him. Nancy was asked, "The person in court, how sure are you that's the individual that shot David the victim?" She responded, "I'm a hundred percent sure."

Nancy did not recall stating to the police that the shooter had dark skin but recalled she stated that the person was Hispanic. She described him as "heavyset." Nancy never saw defendant get out of his car. The victim was wearing a Raiders baseball hat when he was shot.

Ana described defendant as a Hispanic adult male with darker skin, possibly a tattoo on his neck, and appeared to have acne scars on his face. She was shown photographs from the victim's social media accounts and identified defendant as possibly being the shooter. She was not 100 percent certain. Ana chose defendant's photograph on that day from the six-pack photographic lineup. She believed it was the same person she identified in court.

An autopsy was performed on the victim on January 4, 2016. He was 37 years old at the time of his death. He had five bullet wounds in his chest. He had a bullet wound on his arm. Several bullets were taken out of his body. He died as a result of the bullet

7

wounds. He likely died within a matter of minutes. The victim had a tattoo over his eye that read, "hit um."

### 2. *INVESTIGATION*

San Bernardino County Sheriff's Deputy Sprague was on patrol duty in Hesperia on December 25, 2015. At 3:30 p.m. that day, he responded to reports of a shooting at the In-N-Out parking lot near the intersection of Main Street and Mariposa. When he arrived, there was a white SUV parked in the parking lot. There were no other cars. Next to the SUV was a bleeding male, identified as the victim, and two females standing over him. Both of the women were crying. Deputy Sprague initially felt a pulse and observed gunshot wounds on the victim's chest. However, after one minute, the victim no longer had a pulse. The victim was transported to the hospital where he was pronounced deceased.

Detective Goodwin arrived at the In-N-Out around 6:00 p.m. On the ground near where the victim's body had been was a bag of tamales. A black and silver Raiders baseball hat was found near the rear tire of the SUV. No cartridge cases or bullets were found on the ground. Detective Goodwin obtained surveillance video from the In-N-Out burger from between 3:00 and 4:00 p.m. that day.

A burgundy or red truck entered the In-N-Out parking lot and met up with the SUV. The truck left the parking lot at 3:34 p.m. Defendant became a suspect. He was arrested on December 26, 2015. He was apprehended in a red truck matching the one seen in the video surveillance.

The cellular telephone records for defendant's phone were obtained. The victim's cellular telephone number was obtained and his phone records were reviewed. Based on the records, at 1:57 p.m. and 1:58 p.m. on December 25, the victim made calls to defendant's phone. The victim was near his home in Victorville. Defendant's cellular telephone had a call made to it from the victim's phone number. Defendant was at or near his mother's house which was in Hesperia.[3]

At 3:32 p.m., the victim's phone records showed he called defendant's cellular telephone and the records showed that the phone was using a cellular telephone tower near the parking lot of the In-N-Out.

Detective Goodwin also explained that each cellular telephone kept a log of GPS coordinates for advertising purposes. The GPS location of the phone was usually within 30 feet of where the phone was located.[4] The GPS records showed where defendant's phone had been. In the early morning hours of Christmas Day, at 12:50 a.m., defendant's phone was near the victim's home. At 6:38 a.m., the phone was near his residence in West Covina. The next GPS data was from 3:47 p.m. There was no data between these times. At 3:47 p.m., the GPS showed the phone was at Ranchero Road in Hesperia. The phone then appeared to travel to defendant's mother's house and pinged at that location several times throughout the evening.

---

[3] Detective Goodwin explained that cellular telephones would ping off of cellular phone towers which would give an approximate location of the cellular telephone when the call was made.

[4] A sheriff's deputy who was a technical investigator for the sheriff's department also testified to retrieving GPS data from a cellular telephone.

The victim's phone was not found at the scene of the shooting. The last location of the cellular telephone was logged at 3:50 p.m. on December 25 in the area of the 15 freeway and Ranchero Road. The victim's phone records showed it had been at the In-N-Out parking lot, then was taken south on the 15 freeway, and the last location was the off-ramp at Ranchero Road off the 15 freeway. The victim's phone was found on the ground at the off-ramp of Ranchero Road near the 15 freeway. A baseball hat with a "P" on the hat was found near the phone.[5]

The victim's phone was searched including his social media accounts. Several photographs were taken from his two accounts. A contact in the victim's phone was Jboy 12th Street which was attached to the number for defendant. The last phone call made on the phone was to Jboy 12th Street at 3:32 p.m. A call was made to the victim from Jboy 12th Street at 3:17 p.m. The victim sent a text message to Jboy 12th Street at 1:44 p.m. It said, "Traffic cool. Let me know when you start heading up so I can meet you." At 1:46 p.m., the victim received a text message from Jboy 12th Street that said, "Went by your house. Thought you were home. Seen the Navigator, but no one answered." The victim sent a message to Jboy 12th Street at 1:59 p.m. asking "So where are you so I can meet you?" At 2:09 p.m., the victim sent a message, "Well, don't leave without calling so I can meet you."

The victim's residence in Victorville was searched. An old cellular telephone belonging to the victim was located. In the phone was a contact for Jboy 12th Street. A

---

[5] No DNA tests were performed on the victim's phone or the baseball hat.

search warrant was executed at defendant's home located in West Covina. A cellular telephone bill for defendant's phone was obtained. It was the same number listed as Jboy 12th Street in the victim's cellular telephone. A t-shirt with Money Motivated Ink was found. This was a tattoo company owned by the victim.

Defendant's mother, Jacqueline Peterson, lived on Alston Street in Hesperia. Defendant was driving his truck when he arrived around 2:30 p.m. at her house on Christmas Day. He brought his girlfriend and her two children with him. Defendant left the house between 2:30 and 3:00 p.m. but arrived home for dinner which occurred around 4:00 p.m. Peterson claimed defendant left the house to get cigarettes. Defendant seemed normal when he returned for dinner.

Peterson believed that defendant had been a member of a gang while living in Pomona and that he had "Pomona" or "12th Street" tattooed on his head. Peterson indicated that defendant was in the process of removing the tattoo from the back of his head.

### 3. *RECORDED JAIL CONVERSATIONS*

Defendant's daughter spoke with defendant after the shooting and the conversation was recorded. He told her to tell "Nato I said, sharks up." He repeated the word sharks. In another conversation, with his girlfriend, defendant started whispering. In the conversation, he stated, "When I pulled In N out . . . That's when I got mad . . . Fuck this dude. I told you then but . . . David."

11

4. *GANG EVIDENCE*

In 2012, defendant admitted to a detective from the San Bernardino County Sheriff's Department that he was a member of the 12th Street Sharky Pomona gang (12th Street). His tattoos were documented.

Detective Godoy was a designated gang expert. La Eme and 12th Street were both criminal street gangs.[6] 12th Street was a Hispanic gang based in Pomona. The gang had over 500 members and associates. La Eme was the Mexican Mafia under which 12th Street would operate. The Mexican Mafia was capable of issuing an order from jail to a gang member on the street to do work on behalf of the Mexican Mafia.

Detective Godoy believed that defendant was an active 12th Street gang member based on his prior contacts with law enforcement, his tattoos, and a recording after the crime in this case in which he referred to sharks or sharkies. He had a "Pomona" tattoo on his chest and on the back of his head which was a tattoo that a 12th Street member would possess. He also had shark tattoos which was a 12th Street symbol. Gang tattoos showed that defendant was a trusted member of the gang. Defendant also had a "G shield" tattoo which was a symbol of the Mexican Mafia. The tattoo had to be earned by doing work for the Mexican Mafia. Detective Godoy believed that defendant was an associate of the Mexican Mafia. The victim was a member of the Monrovia Criminal Street Gang. Defendant was depicted in a photograph wearing a baseball hat with a P on it which was a symbol of 12th Street.

---

**6** The parties stipulated that La Eme and Pomona 12th Street were criminal street gangs as defined in section 186.22, subdivision (b).

12

In Detective Godoy's opinion, the shooting of the victim benefitted the Mexican Mafia and the 12th Street gang. The crime would put other gangs in the area in fear that a 12th Street member was working on behalf of the Mexican Mafia. It would benefit 12th Street, that they had a member doing crimes on behalf of the Mexican Mafia. Further, mentioning La Eme would put the public in fear. The fact the crime was committed in public in the daytime further would instill fear in others. He was unsure if the victim was an associate of the Mexican Mafia. In searches of defendant's residence and his vehicle nothing was found connecting him to the Mexican Mafia.

B.    DEFENSE CASE

The only evidence presented was an excerpt from a book written by a former member of the Mexican Mafia setting forth the rules of being a member. These included that a member may not be a homosexual, an informant, a coward, must not raise a hand against another member without sanction, not show disrespect for any member's family, not steal from another member, interfere with another member's business activities, and not politic against another member or cause deception within the organization. Further, membership was for life and it was mandatory to assault/kill all defectors and dropouts.

**DISCUSSION**

A.    EYEWITNESS INSTRUCTION

In his opening brief, defendant contended that the trial court violated his federal constitutional due process rights by improperly instructing the jury pursuant to CALCRIM No. 315 that a witness's level of certainty is a factor to be considered in evaluating the accuracy of identification testimony. He insisted that scientific studies

13

have shown that certainty is not a determining factor of accuracy. After the initial briefing was complete, the California Supreme Court issued its opinion in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*) finding that CALCRIM No. 315 does not instruct a jury that certainty equals accuracy and does not violate due process. In *Lemcke*, the defendant presented expert testimony on eyewitness identification discussing the relationship between certainty and accuracy. The parties submitted supplemental briefing addressing whether the lack of expert testimony in this case renders it dissimilar from *Lemcke*, and the instruction violated defendant's due process rights.

### 1.    *ADDITIONAL FACTUAL HISTORY*

Here, the jury was instructed with CALCRIM No. 315 in pertinent part as follows: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] "How certain was the witness when he or she made an identification." Several other factors were listed.

The jury was instructed in addition to CALCRIM No. 315 that, "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. [¶] You must judge the testimony of each witness by the same standards setting aside any bias or prejudice you may have. You may believe all, part of none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe. [¶] In evaluating a

14

witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony."

They were further advised they must find defendant guilty beyond a reasonable doubt based on all the evidence presented.

### 2. *WAIVER*

The People contend defendant has waived the claim on appeal by failing to object to the wording of the instruction in the trial court. There were no objections to the instruction.

In *People v. Sánchez* (2016) 63 Cal.4th 411, 461-462 (*Sánchez*), the court considered the defendant's argument that because there was "at best, a weak correlation between . . . certainty and accuracy," the trial court erred in instructing the jury with CALJIC No. 2.92, the CALJIC equivalent to CALCRIM No. 315. However, it first addressed waiver. The court stated, "The Attorney General argues the claim is forfeited because defendant did not request that CALJIC No. 2.92 be modified. We agree. If defendant had wanted the court to modify the instruction, he should have requested it. The trial court has no sua sponte duty to do so." (*Sánchez*, at p. 461.) As such, defendant forfeited his claim of instructional error by failing to seek modification of CALCRIM No. 315 in the trial court.

Defendant insists that if this court finds he waived his claim, that he received ineffective assistance of counsel. Rather than address this issue, we will address the

15

merits of defendant's claim—despite him waiving the issue—in order to consider if defendant suffered prejudice.[7]

### 3. *LEMCKE*

In *Sánchez*, the court examined CALJIC No. 2.92 which contained similar language as in CALCRIM No. 315 instructing the jury to consider in evaluating witness testimony " 'the extent to which the witness is either certain or uncertain of the identification.' " (*Sánchez, supra*, 63 Cal.4th at p. 461.) The *Sánchez* court acknowledged that "some courts have disapproved instructing on the certainty factor in light of the scientific studies." (*Sánchez, supra*, 63 Cal.4th at p. 462.) However, it found the instruction was proper when uncertain and certain identifications were involved. Moreover, it also found no prejudice concluding "[t]he instruction cited the certainty factor in a neutral manner, telling the jury only that it could consider it. It did not suggest that certainty equals accuracy. In this case, telling it to consider this factor could only benefit defendant when it came to the uncertain identifications, and it was unlikely to harm him regarding the certain ones." Further, it found no prejudice as "the eyewitness identifications were far from the only evidence connecting [the] defendant to the crimes." (*Id.* at p. 462.)

---

[7] To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v Washington* (1984) 466 U.S. 668, 688, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

16

In *Lemcke*, our high court revisited the issue in determining whether the certainty language in CALCRIM No. 315 violated due process. The court found that "we find nothing in CALCRIM No. 315's instruction on witness certainty that operates to 'lower the prosecution's burden of proof.' " (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) It further held, "the instruction does not direct the jury that 'certainty equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Lemcke,* at p. 657.)

The California Supreme Court also stated that "Although the wording of the instruction might cause some jurors to infer that certainty is generally correlative of accuracy" the defendant presented expert testimony to "combat the inference." (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) The court found this was an additional factor in finding that defendant's due process rights were not violated. It further referred to the other instructions given to the jury, including that the jury had to find defendant guilty beyond a reasonable doubt. (*Id.* at p. 658.)

In *Lemcke*, the California Supreme Court further acknowledged that the form of CALCRIM No. 315 "has the potential to mislead jurors" given "the empirical research that ' "under most circumstances, witness confidence or certainty is not a good indicator

of identification accuracy." ' " (*Lemcke*, *supra*, 11 Cal.5th at p. 665.)  Thus, while the defendant "failed to establish that the trial court's decision to include the certainty factor in CALCRIM No. 315 violated his due process rights or otherwise constituted error under the circumstances presented here[, the court recognized the] risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy." (*Lemcke*, at p. 669.)  Thus, the court directed "trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Ibid.*)

Based on the findings in *Sánchez* and *Lemcke*, the instruction here did not violate defendant's due process rights.  Defendant insists that CALCRIM No. 315 erroneously invited jurors to infer eyewitness certainty provided accuracy.  However, the California Supreme Court has specifically stated that the instruction does not equate certainty with accuracy.  Defendant further contends that after *Lemcke*, without expert witness testimony, the instruction violates due process.  As stated, in *Lemcke*, the defendant called an eyewitness identification expert who explained the limited circumstances when certainty and accuracy are positively correlated. (*Lemcke*, *supra*, 11 Cal.5th at p. 657.)

However, *Lemcke* first found that the instruction did not violate due process based on the fact it was only one of several factors the jury considered in evaluating witness testimony and it did not direct the jury that certainty equals accuracy. (*Id.* at p. 657.)  The court only addressed the expert witness testimony in further concluding that the instruction did not violate due process but did not indicate that it was crucial to the

18

analysis. The fact that there was no eyewitness identification expert testimony does not render this case different from *Lemcke*.

### 4. *PREJUDICE*

Further, even if the instruction should have been modified to exclude this factor, any conceivable error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 ["harmless beyond a reasonable doubt" standard for constitutional errors]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability standard for state law errors].)

Although the prosecutor noted during closing argument that the eyewitness testimony from Ana and Nancy "really form the backbone of this case" there was uncertainty in the identifications from Nancy and Ana. They both struggled to identify defendant prior to trial. As stated in *Sánchez*, which was not overruled in *Lemcke*, "[t]he instruction cited the certainty factor in a neutral manner, telling the jury only that it could consider it. It did not suggest that certainty equals accuracy. In this case, telling it to consider this factor could only benefit defendant when it came to the uncertain identifications, and it was unlikely to harm him regarding the certain ones."

The court in *Sánchez* further found, as previously stated, that the eyewitness identifications were not the only evidence connecting the defendant to the crimes. (*People v. Sánchez, supra*, 63 Cal.4th at p. 462.) Similarly, here, the testimony of Ana and Nancy was not the only evidence that supported that defendant was the shooter. Defendant's red truck was seen on In-N-Out surveillance entering and exiting the parking lot around the time of the shooting. In addition, the victim and defendant exchanged

19

telephone calls and text messages addressing meeting up that day. On the way to the In-N-Out, Nancy stated that she saw the name Jboy 12th Street on the victim's phone, which was the contact for defendant. The GPS and cellular telephone tower evidence established that defendant was in the area of the In-N-Out during the time of the shooting. Defendant's own mother provided evidence that he was away from her house in Hesperia during the time of the shooting. Finally, defendant mentioned the In-N-Out and "David" in his jailhouse conversation. As such, even though the eyewitness testimony assured that defendant was the shooter, other circumstantial evidence established that defendant shot the victim in the parking lot on Christmas Day. As such, he has suffered no prejudice.

B.    CONTINUANCE FOR MOTION FOR NEW TRIAL

Defendant contends the trial court erred by denying his request for a continuance of sentencing so that he could conduct DNA testing on the victim's cellular telephone and the baseball hat found nearby as such a request for a continuance was supported by good cause. The denial also violated his rights to due process, a fair trial, and the right to effective assistance of counsel at all stages of the trial proceedings. The matter should be remanded for DNA testing to be performed on the phone and baseball hat, and depending on the results, he should be given an opportunity to renew his request for a new trial.

1.    *ADDITIONAL PROCEEDINGS*

Prior to trial, defendant's retained counsel, Mark Shapiro, sought several continuances both to prepare for trial and to obtain DNA results on the "P" hat and the victim's cellular telephone. Defendant agreed to waive time from January 2017 through

20

July 2017. The People had chosen not to test the items. Shapiro sought an order for funding so he could conduct his own DNA testing and defendant agreed to waive time. On October 27, 2017, Shapiro was still waiting for testing and defendant stated it was the last time he was going to waive time. On December 1, 2017, defendant did not want to waive time but agreed to a 60-day continuance. On February 9, 2018, Shapiro stated that he was not ready to go to trial but defendant refused to waive time. Defendant reluctantly agreed to a continuance if trial started in 60 days.

On May 25, 2018, Shapiro again wanted to continue the case for DNA testing. On July 6, 2018, the DNA had still not been tested but defendant did not agree to a continuance. On July 13. 2018, Shapiro stated he was not ready to proceed to trial because he was still waiting for the testing of the DNA on the baseball hat and the victim's telephone which was crucial to the defense. Defendant stated on the record, "I don't want to waive time I want to go forward." The trial court found good cause to continue the case over defendant's objection. The baseball hat and the victim's telephone were being sent to an independent lab.

On October 14, 2018, defendant refused to waive time but the attorneys were engaged in trial. The trial began on October 16, 2018. During opening argument, Shapiro argued to the jury that the police focused on defendant and did not look anywhere else. They did not have DNA testing on the baseball hat and the victim's telephone.

21

The jury verdict was reached on November 5, 2018. Defendant obtained new counsel on February 8, 2019. The matter was continued until June 2019 when defendant's new counsel filed a motion for new trial.

Defendant's counsel filed his motion for new trial on June 25, 2019. Defendant raised several claims including that the People did not provide all of the discovery to the defense, a recreation video of the shooting should have been excluded and improper gang evidence was introduced. Further, he claimed ineffective assistance of counsel including that his trial counsel failed to call a cellular telephone expert and failed to object to inadmissible evidence. There was no mention of the DNA testing on the baseball hat or the victim's telephone. However, in defendant's declaration, he stated that his trial counsel never tested for DNA and fingerprints despite having an order to do so. Defendant did not specify the items to be tested. The People filed opposition.

The motion for new trial was heard on September 27, 2019. Defendant testified in support of the new trial motion. He complained about the GPS evidence and that the transcript of the jail call was inaccurate. Defendant also insisted that Shapiro convinced him not to testify. There was no mention of the DNA testing. Shapiro also testified. Shapiro stated that he had originally wanted to test the baseball hat and the victim's telephone. However, he and defendant agreed that they did not want to proceed with the testing because Shapiro explained to defendant the aiding and abetting rule. Even if defendant was not the shooter, he could have been present and aided and abetted the shooting. Also, defendant wanted to hurry and go to trial. Shapiro did hire a private lab to conduct the DNA test but stopped the process.

22

The matter was taken under submission and sentencing was scheduled for October 18, 2019. The matter was continued to October 25, 2019. The trial court issued a written denial of the motion for new trial. In the denial of the motion for new trial, the trial court noted, "Defendant faults Mr. Shapiro for not hiring a DNA expert. At the evidentiary hearing, Mr. Shapiro testified that he obtained funding approval from the court . . . to have an outside lab conduct DNA testing and that he wanted to conduct testing on [the victim]'s cell phone and the hat that were found off Ranchero Road. Mr. Shapiro testified that the defendant was not interested in having DNA testing completed and that Mr. Shapiro also explained to the defendant that eve if someone else's DNA came back on one or more of these two items, the People can still proceed with their case against defendant by relying on an aiding and abetting theory in light of the other evidence showing that the defendant had arranged to meet with [the victim] when [the victim] was shot and killed. At the evidentiary hearing, Mr. Shapiro testified that the defendant was constantly objecting to waiving time to continue the trial date and did not want to have the DNA testing done. The court credits that testimony." The trial court also concluded that defendant had failed to show prejudice based on the overwhelming evidence of guilt.

On October 25, 2019, the date of sentencing, defendant's new counsel requested a continuance in order to complete the DNA testing on the victim's telephone and the baseball hat. The items had been sent to a laboratory for testing but had been intercepted by the mail service as suspicious. New counsel attested that the items had only recently been received by the independent laboratory. Defendant's counsel insisted the baseball

23

hat and the victim's telephone were relevant if DNA on the two items did not belong to defendant. It was relevant to show he was not the shooter.

The trial court noted that the motion for new trial had already been denied and that new counsel had come on the case in February 2019. New counsel was aware all along there had been no DNA testing. The trial court ruled, "And so looking as I sit here today, and this has already been addressed in the Court's order denying the motion for a new trial, is the Court is not going to sit here and speculate at this juncture, you know, with the delays that we've had in this case. And the Court has accommodated both counsel with the delays. [¶] But I think at this point there's nothing before the Court to indicate, and the Court has already ruled on the motion for new trial. So the Court is going to proceed forward with sentencing."

2. *ANALYSIS*

"Continuances shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) " '[T]he decision whether or not to grant a continuance of a matter rests within the sound discretion of the trial court. [Citations.] The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.] [¶] Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 650.)

"In reviewing the decision to deny a continuance, '[o]ne factor to consider is whether a continuance would be useful.' " (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.) The court considers " ' "not only the benefit which the moving party anticipates

but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (*Mungia*, at p. 1118.)

Here, the trial court did not abuse its vast discretion in denying defendant's motion for continuance made after the denial of the motion for new trial. Initially, at the time that defendant's new counsel asked for the continuance, he had been representing defendant for eight months. Counsel was aware of the DNA testing as Shapiro testified regarding the decision not to conduct such testing at the motion for new trial. Defendant's new counsel provided no reason for waiting until sentencing to make the request to test the items rather than in the motion for new trial. Although counsel stated that somehow the items had been held up in the mail, counsel made no representation as to any investigation into the DNA testing before sentencing. The DNA testing had been an issue since the start of trial and did not constitute good cause to continue the sentencing.

Additionally, as noted by the prosecutor, the victim's family was present in court for the sentencing having traveled from Arizona and other areas to be present at the sentencing. Defendant dismisses the importance of their presence arguing that they could have put their statements on the record for later sentencing. However, the trial court

reasonably could consider the families in deciding not to continue the sentencing.  (See *People v. Jenkins*, *supra*, 22 Cal.4th at p. 1037.)

Moreover, defendant failed to show that a continuance would be "useful."  (*People v. Mungia*, *supra*, 44 Cal.4th at p. 1118.)  Defendant's counsel insisted that the DNA testing was relevant if it showed that the DNA on the victim's phone and baseball hat did not belong to defendant.  This evidence, even if it showed DNA from some other party would not have resulted in a reversal of defendant's conviction.  The trial court already determined in denying the motion for new trial that such evidence would not change the result of the proceedings.

Further, as stated *ante,* defendant's red truck was seen in the In-N-Out parking lot at the time of the shooting; he was identified as the shooter; defendant's cellular telephone was tracked to the area of the shooting; the victim was on the phone with defendant as he pulled into the In-N-Out parking lot to give him tamales; and defendant mentioned "David" and In-N-Out during a taped jail conversation.  Even if the DNA testing had been complete, the fact that someone other than the victim or defendant was on the items, that would not exonerate defendant.  The trial court did not abuse its discretion by denying defendant's motion for continuance after the denial of his motion for new trial.

C.    <u>AB 333</u>

1.    *RETRIAL OF GANG ENHANCEMENT—PENAL CODE SECTION 186.22, SUBDIVISION (B)(1)(C)*

Defendant contends the gang enhancement found true pursuant to 186.22, subdivision (b)(1)(c), must be vacated and the cause remanded for the People to choose whether to retry the enhancement based on AB 333's amendment of section 186.22 effective after his trial. He insists that under the principles of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the revisions should be applied retroactively since his case is not final.

Section 186.22 enhances the punishment of a person convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1); see also *People v. Sek* (2022) 74 Cal.App.5th 657, 664 (*Sek*).) "[AB] 333 took effect on January 1, 2022 and amended section 186.22 by modifying the definitions of 'pattern of criminal activity' and 'criminal street gang,' and it clarified what is required to show an offense 'benefit[s], promote[s], further[s], or assist[s]' a criminal street gang." (*People v. Perez* (2022) 78 Cal.App.5th 192, 206, review granted Aug. 17, 2022, S275090.)[8]

---

[8] Despite review being granted by the California Supreme Court in many of these AB 333 cases, the cases may be cited for their persuasive authority and for establishing the existence of a conflict of authority. (Cal. Rules of Court, rule 8.1115 (e)(3).)

27

"[T]he Legislature enacted Assembly Bill No. 333, which amended section 186.22 to impose new substantive and procedural requirements for gang allegations. Most notably, the law defined 'to benefit, promote, further, or assist' as 'to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.' [Citation.] In addition, the law created a stricter requirement for proof of 'a pattern of criminal gang activity,' which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. [Citation.] Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. [Citation.] Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses. [Citation.] In addition, both predicate offenses must have been committed 'within three years of the date the current offense is alleged to have been committed,' by gang 'members,' and must have been for the 'common[] benefit[] [of] a criminal street gang.' " (*Sek*, *supra*, 74 Cal.App.5th at p. 665.)

The California Supreme Court has affirmed that these amendments to section 186.22 should be applied retroactively. In *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*), the court explained, "*Estrada* 'stand[s] for the proposition that (i) in the absence of a contrary indication of legislative intent, (ii) legislation that ameliorates punishment (iii)

28

applies to all cases that are not yet final as of the legislation's effective date.' [Citation.]

*Estrada* applies to statutory amendments 'which redefine, to the benefit of defendants, conduct subject to criminal sanctions.' [Citation.] Here, '[AB] 333 essentially adds new elements to the substantive offense and enhancements in section 186.22—for example, by requiring proof that gang members 'collectively engage' in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and underlying offenses provided more than a reputational benefit to the gang . . . .' [Citations.] These changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' with obvious benefit to defendants like Tran." (*Id*. at pp. 1206-1207.)

The People concede, and we agree, that the amendments could benefit defendant and thus AB 333 applies retroactively to defendant's case in relation to the gang enhancement found true pursuant to section 186.22, subdivision (b)(1)(C). (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 478.) The appropriate remedy is to remand the matter to the trial court to give the People an opportunity to retry the gang enhancement allegation under the new law. (*Sek*, *supra*, 74 Cal.App.5th at p. 669) We vacate the true findings on the section 186.22, subdivision (b)(1)(c), enhancement and remand to the trial court for further proceedings.

## 2. *GANG SPECIAL CIRCUMSTANCE—PENAL CODE SECTION 190.2, SUBDIVISION (A)(22)*

Defendant further contends the gang murder special circumstance found true by the jury pursuant to section 190.2, subdivision (a)(22), must also be reversed based on the same amendments to section 186.22 as discussed *ante*. The People argue that such amendment violates the voter initiative Proposition 21 and should be excluded from the amendments to section 186.22.

Under section 190.2, subdivision (a)(22), the punishment for first degree murder is death or life without the possibility of parole if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." Section 190.2, subdivision (a)(22), expressly incorporates the statutory definition of what constitutes a criminal street gang as set forth in section 186.22, subdivision (f). AB 333 changed the definition of "criminal street gang." "Criminal street gang" was previously defined as an "ongoing organization, association, or group of three or more persons . . . whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f).) It is now defined as an "ongoing, organized association or group of three or more persons . . . whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) The People concede these amendments can be interpreted to apply to the gang special circumstance but contend that such amendment is invalid as applied to section 190.2, subdivision (a)(22).

30

The gang special circumstance was part of the voter initiative Proposition 21 passed in 2000 whose purpose was to impose "severe penalties" for gang-related felonies. (*People v. Rojas* (2022) 80 Cal.App.5th 542, 550, review granted Oct. 19, 2022, S275835.) "Proposition 21 does not permit any legislative amendment except upon two-thirds passage of each house or enactments subject to voter approval." (*Id.* at p. 553) In *Rojas,* the court found that "[b]ecause [AB] 333 'takes away' from the scope of conduct that Proposition 21 made punishable under section 190.2, it is an amendment. While the Legislature was free to amend Proposition 21 in this fashion, it could only do so with a two-thirds vote in each house. [Citations.] [AB] 333 did not comply with that requirement and therefore cannot amend Proposition 21." (*Id.* at p. 555.) It concluded, "The appropriate remedy is not to void [AB] 333 in its entirety, but rather to disallow this unconstitutional application of [AB] 333. [Citation.] Consequently, we hold that [AB] 333 does not alter the scope or effect of section 190.2, subdivision (a)(22). (*Id.* at pp. 557-558.)

Several other courts have found that AB 333 did not unconstitutionally amend section 190.2, subdivision (a)(22). (See *People v. Lee* (2022) 81 Cal.App.5th 232, review granted on Oct. 19, 2022, S275449; *People v. Lopez* (2022) 82 Cal.App.5th 1, 15.) In *Lee*, the court explained that "amendment of the definition 'criminal street gang' by AB 333 does not prohibit what Proposition 21 authorized, or authorize what Proposition 21 prohibited. We find nothing to suggest that the electorate intended to impose a time-specific incorporation of the term 'criminal street gang' in the gang-murder special circumstance statute. Thus, we conclude that the term 'criminal street gang' as

incorporated in the gang-murder special circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (*Lee*, at p. 245.) The court in *Lopez* found that the voters gave no indication of any intent to " 'freeze [the] statutory definition' " of criminal street gang and that defendant should be entitled to the benefit of the amendments. (*Lopez*, at pp. 22, 24-25.) We adopt the findings in *Lee* and *Lopez* and find that AB 333 did not unconstitutionally amend section 190.2, subdivision (a)(22).

The People concede that if this court finds AB 333's amendment of the gang murder special circumstance is not unconstitutional, the proper remedy is remand to the trial court for retrial. We agree and will order that the gang murder special circumstance be reversed. We will remand to the trial court for further proceedings.

### 3.    *PENAL CODE SECTION 1109*

AB 333 added section 1109, which allows a defendant to request a bifurcated trial when there is a gang enhancement allegation. (§ 1109, subd. (a); *Sek*, *supra*, 74 Cal.App.5th at p. 665.) If the defendant so requests, the trial court *must* try the case in two separate phases: "(1) The question of the defendant's guilt of the underlying offense shall be first determined," and then "(2) If the defendant is found guilty of the underlying offense and there is [gang enhancement allegation], there shall be further proceedings to the trier of fact on the question of the truth of the enhancement." (§ 1109, subds. (a)(1) and (a)(2).)

Defendant insists that section 1109 should apply retroactively to his case under *Estrada*, *supra*, 63 Cal.2d 740. All of his convictions should be reversed and the matter

remanded for retrial of the offenses in two separate phases. The People argue section 1109 applies prospectively only and that any error in not bifurcating the proceedings was harmless in any event.

The Courts of Appeal are split on whether section 1109 applies retroactively. Some courts have held that section 1109 applies retroactively under *Estrada*. (*People v. Burgos* (2022) 77 Cal.App.5th 550, 568, review granted July 13, 2022 (S274743); *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129-1130.) Other courts have found it applies only prospectively. (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022 (S275341); *People v. Perez*, *supra*, 78 Cal.App.5th at p. 207.) The issue is currently under review with the California Supreme Court in *Burgos*. Most recently, in *People v Tran*, *supra*, 13 Cal.5th at page 1208, the California Supreme Court declined to resolve the split, concluding any failure to bifurcate the gang allegations was harmless.

We need not decide the issue because we conclude any failure to bifurcate the proceedings in this case was harmless. We therefore assume, without deciding, that section 1109 applies retroactively. (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480 [assuming without deciding that section 1109 applies retroactively].)

We find that the introduction of gang evidence in this case was not prejudicial under *People v. Watson* (1956) 46 Cal.2d 818. (*Tran*, *supra*, 13 Cal.5th at pp. 1209-1210.)[9] Initially, the gang evidence was properly admitted to prove the gang murder

---

[9] As the court in *Tran*, we reject defendant's contention that review is subject to the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18. The admission of gang evidence in this case did not render his trial fundamentally unfair. (*Tran*, *supra*, 13 Cal.5th at p. 1209.)

special circumstance. "[S]ection 190.1 'require[s] the truth of a prior murder conviction special circumstance be tried only after the guilt determination, but other special circumstances, including a gang special circumstance . . . , be determined at the same time as the guilt determination." (*People v. Montano* (2022) 80 Cal.App.5th 82, 110.) Section 1109 "does not apply to the determination of special circumstance allegations under section 190.2 (a)(22)." (*Montano* at p. 114.) Hence, much of the gang evidence introduced at trial was admissible to prove the gang murder special circumstance. As such, defendant cannot show prejudice by the failure to bifurcate the finding on the gang enhancements as the evidence was properly admitted at trial.

Defendant has contended that the *People v. Bigelow* (1984) 37 Cal.3d 731 (*Bigelow*) exception applies, which requires a separate trial on a special circumstance in general, or at least in this particular case. The gang evidence would not have been admitted in the murder trial as it would have only been admissible in a bifurcated trial on the special circumstance.

In *Bigelow*, the court found that "If evidence *relevant only* to a special circumstance is introduced at the guilt trial, . . . , it should be accompanied by a jury instruction limiting its use. When that evidence is highly prejudicial, the court should exclude it at the guilt trial and conduct a separate trial of the special circumstance allegations." (*Bigelow, supra*, 37 Cal.3d at p. 748, fn. omitted, italics added.) The California Supreme Court addressed the *Bigelow* exception in *People v. Fierro* (1991) 1 Cal.4th 173, a death penalty case. In *Fierro*, the defendant moved to bifurcate trial on the guilt phase and the special circumstance allegation, relying on *Bigelow*. The request was

34

denied and the California Supreme Court upheld the ruling. It stated, "The court's ruling was correct. The statutory scheme plainly contemplates that, except where the special circumstance alleged is that of a prior murder, the same jury which determines guilt shall also at the same time determine the truth of the special circumstance allegation: 'The question of the defendant's guilt shall first be determined. If the trier of fact finds the defendant guilty of first degree murder, it shall *at the same time* determine the truth of all special circumstances charged . . . except . . . where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree.' [Citation.] [¶] Defendant's reliance on . . . *Bigelow*, *supra*, 37 Cal.3d 731, is misplaced. In that case, one of the special circumstance allegations was murder for the purpose of avoiding arrest or perfecting an escape. [Citation.] At the guilt phase the prosecution presented evidence highly prejudicial to the defendant, indicating that he had committed a dozen uncharged burglaries, robberies and thefts; the prosecution's primary theory of relevance was that the defendant committed each of the crimes to finance and perpetuate an escape from custody, which was relevant to the special circumstance allegation. Because of the 'highly prejudicial' nature of the prior-crimes evidence, we concluded that the trial court should have conducted a separate trial of the special circumstance allegation. [Citation.] [¶] The facts of the present case are not even remotely similar to those in *Bigelow*. No evidence was presented to the jury during the guilt phase which could be characterized as so 'highly prejudicial' [citation] that the jury's ability to render a fair and impartial verdict on the special circumstance allegation would be impaired." (*Fierro*, at p. 229.)

35

The *Montano* court recognized the *Bigelow* exception and *Fierro*. It noted, "Our research discloses no published case holding bifurcation of a special circumstance murder allegation is permissible other than as provided in section 1901.1 et seq."[10] (*Montano*, *supra*, 80 Cal.App.5th at p. 111.) Here, the prosecution was not seeking the death penalty.

Moreover, the gang evidence was relevant to the murder charge in this case and not to just prove the special circumstance. It was admissible to show identity in that the two witnesses, Nancy and Ana, observed that the victim was speaking with Jboy 12th Street on his phone just prior to meeting up with defendant in the parking lot. The shooter also shouted "La Eme" during the shooting tending to show that a gang member committed the shooting. Evidence of a defendant's gang affiliation can be admissible to prove identity. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1022 [" 'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime' "].) Additionally, the

---

[10] Section 190.1, subdivision (a), which applies to death penalty cases, provides, "(a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree."

evidence admitted was not "highly prejudicial." The *Bigelow* exception is not supported in this case.

Regardless, the evidence of defendant's guilt was overwhelming even without the gang evidence. Defendant was positively identified by Nancy and Ana. Further, even without the eyewitness testimony, defendant's red truck was seen on In-N-Out's surveillance entering and exiting the parking lot around the time of the shooting. In addition, the victim and defendant exchanged telephone calls and text messages addressing meeting up that day. On the way to the In-N-Out, Nancy stated that she saw the name Jboy 12th Street on the victim's phone, which was the contact for defendant. Even though defendant's gang moniker was introduced, it was only to establish that it was defendant on the phone and this evidence would have been admitted in some form even if the gang reference was omitted. The GPS and cellular telephone tower evidence established that defendant was in the area of the In-N-Out during the time of the shooting. Defendant's own mother provided evidence that he was away from her house in Hesperia during the time of the shooting. Finally, defendant mentioned the In-N-Out and "David" in his jailhouse conversation.

The admission of gang evidence in this case was not prejudicial and a retrial on all of the charges is not required.[11]

---

[11] We note that since we have ordered remand to the trial court for either retrial of the gang enhancement and gang murder special circumstance, or resentencing, the trial court shall apply all current sentencing laws at the time of resentencing. This shall include, but is not limited to, the discretion to strike an enhancement pursuant to section 12022.53, subdivision (h).

## DISPOSITION

We reverse defendant's sentence.  We additionally reverse the true findings on the gang murder special circumstance (§ 190.2, subd. (a)(22)), and the gang enhancement (§ 186.22, subd. (b)(1)(C).)  The People may elect to retry those allegations under the law as amended by AB 333.  If the People elect not to retry those allegations, defendant shall be resentenced.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

MILLER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

38